**EXHIBIT D**



Madison Square Garden
5 Penn Plaza, 23rd Fl., New York, NY 10001
212-256-1109 | 1-877-9-SELLER
www.AmazonSellersLawyer.com

June 9, 2017

CSC Services of Nevada, Inc.,
c/o Amazon Services, LLC
2215-B Renaissance Drive
Las Vegas, NV 89119                                     **Via US Mail**


American Arbitration Association Case Filing Services
1101 Laurel Oak Road, Suite 100
Voorhees, NJ 08043                                      **Via US Mail**

John Goldmark, Esq.
Attorney for Amazon
Courtesy Copy                                           **Via Email**


                Re:    **Amazon v. ePort, Inc. and David Portugal, individually**


Dear Corporation Service Company and American Arbitration Association:

This law firm represents David Portugal personally. This Answer is submitted on Mr. Portugal's behalf. As set forth below, the corporate respondent ePort, Inc., no longer exists. However, should the AAA continue with this matter despite not having jurisdiction over either Mr. Portugal or the dissolved entity ePort, Inc., then this Answer is also submitted in ePort's behalf despite various issues pertaining to a non-existent entity. This Answer is submitted without waiving any rights. All claims asserted by Amazon that are not specifically addressed below are denied.

In sum, ePort, Inc., ("ePort") was a corporation that operated a sellers' account on Amazon.com. Mr. Portugal was an employee and shareholder of ePort who had no interaction with Amazon except in his role as an employee of ePort.

Summary of Positions:

1. The AAA has no jurisdiction over David Portugal because he never acted in any manner with Amazon except in his role as an employee and shareholder of a corporation. Mr. Portugal never personally guaranteed the re-financing loan at issue. There is no basis for any claims against Mr. Portugal personally;

**ATTORNEYS**
CJ Rosenbaum, Esq.
Anthony Famularo, Esq.

**PARALEGALS**
Kerry McDonald          Robert Segal
Vincent Famularo        Alex Maglione

**PUBLIC RELATIONS**
Lisa Belman

**SHENZHEN OFFICE MANAGER**
Cherish Mei

212-256-1109   |   1-877-9-SELLER   |   www.AmazonSellersLawyer.com

2. The AAA has no jurisdiction over ePort, because the corporation was dissolved prior to the filing of the Demand for Arbitration. The corporation no longer exists;

3. If the AAA has jurisdiction over either named party, there is no liability. Amazon claims that Mr. Portugal is liable for a loan Amazon granted to ePort to refinance a prior debt to Amazon. Amazon claims that Mr. Portugal is liable for the debt because when Mr. Portugal, in his position with the corporation, clicked a box that confirmed that he had no bankruptcies on his credit report. Mr. Portugal was 100% accurate. There were no bankruptcies on his credit report. While Mr. Portugal did previously file for bankruptcy, his bankruptcies were more than ten (10) years old and therefore not on any credit history. In fact:

   - Per Amazon's position, Washington law applies, and;
   - Under Washington law, bankruptcies that are more then ten (10) years old are not permitted to appear on any credit histories.

Timeline of Events:

ePort began selling automotive parts on the Amazon platform as "Internet Sales" in 2011. Internet Sales was owned and operated by ePort, a North Carolina corporation. ePort was dissolved on or about January 10, 2017.

On or about March 9, 2014, Internet Sales was offered its first loan from Amazon in the amount of $40,000.00. Amazon subsequently offered multiple re-finance offers. On or about March 5, 2015, Amazon offered and Internet Sales accepted a $411,000.00 refinance offer. Within three months of loaning over four hundred thousand dollars, Amazon suspended the account on June 3, 2015. A suspension stops all sales.

When Internet Sales accepted the loan from Amazon, it was on pace to conduct over $13 million in sales that year. The suspension was a result of Amazon unilaterally changing its policies.

Amazon then attempted to force ePort to utilize its "Fulfillment by Amazon Services," or "FBA." Amazon's FBA is a system in which sellers ship their products to Amazon owned warehouses and Amazon then ships the products to customers on the seller's behalf. Amazon makes more money from sellers that use FBA than from sellers that do not use FBA.

Due to the nature of our client's business (automotive parts), changing to Amazon's FBA system was impossible because it required shipment of over 160,000 parts in inventory to Amazon warehouses. ePort's Amazon business began decrease because of Amazon's unilateral change in its policies that favored FBA sellers.

Amazon then used the data it maintained about ePort's sales and began to compete with ePort. Amazon itself repeatedly offered the same products as ePort for less money and with faster shipping rates that ePort could provide.

Amazon further damaged ePort's business, and ePort's ability to re-pay Amazon, by placing its own goods in what is called the "Buy Box." When multiple sellers are selling the same product, consumers are more likely to purchase the version that is in the Buy Box. Usually the seller with the lowest prices has their products in the Buy Box. Amazon gave itself the Buy Box on products that directly competed with ePort even though Amazon's prices for the same items were 10-20% higher than ePort's prices.

To add insult to injury, Amazon further harmed ePort's business and its ability to repay Amazon's loan by telling buyers that if they utilized third-party sellers like ePort, their items may not arrive in time for the holiday season.

Amazon placed ePort in substantial debt then harmed ePort's business and its ability to repay the debt.

On or about November 1, 2016, Amazon approached ePort, to refinance its' then existing debt to Amazon. This was the last of **multiple** loans and re-financings of debt Amazon placed with ePort. Amazon approached ePort to provide financing and refinancing, ePort did not seek out any loans.

With specific regard to the predatory lending discussed below:

- Amazon used information it had about ePort's success and used it against ePort as it became ePort's competitor;
- Amazon repeatedly approached ePort to refinance and increase ePort's debt to Amazon at the same that Amazon was damaging ePort's business;
- This last refinance, as well as prior re-financings(s), were during periods of time that ePort's Amazon account was suffering declining sales due to Amazon competing directly with ePort and multiple and unilateral changes in Amazon's policies that harmed ePort, and;
- Amazon was fully aware that ePort was suffering declining sales when Amazon approached ePort to re-finance and increase its' debt to Amazon.

Due to ePort's declining sales and the debt payments to Amazon, ePort was forced to close it's Amazon store.

On or about January 10, 2017, ePort was dissolved. ePort no longer exists.

Jurisdictional Statements:

### *David Portugal: No Personal Jurisdiction; No Personal Liability*

By filing this answer, Mr. Portugal does not consent to jurisdiction over him in his individual capacity. The loan at issue was solely issued to ePort, **not to Mr. Portugal**. There is no personal guarantee. Mr. Portugal cannot be held personally liable for a corporation's debt absent a declaratory judgment piercing the corporate veil.

As such, the American Arbitration Association has no jurisdiction over Mr. Portugal.

### *ePort, Inc.: No Jurisdiction over a Dissolved Corporation*

The American Arbitration Association lacks jurisdiction over ePort, because the entity no longer exists. As set forth above, ePort was dissolved without any objection by Amazon.

Should Amazon wish to bring any action against ePort, they likely need to first challenge the corporation's dissolution in North Carolina.

Defenses:

### *Breach of Contract*

Amazon claims that Mr. Portugal is personally liable for the remaining payments which are due on the November 1, 2016 loan. However, Mr. Portugal is not bound by the loan agreement. He did not borrow any money. He did not guarantee any loan. He did not act in any fashion other than in his role as an employee and/or shareholder of the corporation.

In fact, if the agreement is reviewed, specifically § 5.2 of the agreement, there is no remedy in the agreement for Amazon to hold Mr. Portugal personally liable for anything.

### *Fraud*

In addition to breach of contract, Amazon claims Mr. Portugal committed fraud because our client attested that his credit history was clear of bankruptcies. Specifically, our client attested to the following:

> "Credit History: The business and its owner's credit histories are clear of bankruptcy, serious delinquency, open judgment and tax liens."

This provision refers to Portugal's *Credit History*. Chapter 7 bankruptcy discharges are final judgments and are not *open*.

Amazon certainly could have chosen to request a statement regarding whether or not any shareholder had ever at any time filed for bankruptcy and/or whether any judgments had ever been entered against any shareholder. Amazon chose not to do so.

To the extent the phrase *Credit History* may be subject to more than one interpretation, then it is unclear and ambiguous. Amazon drafted the provision. It is fundamental law that contractual ambiguities are construed against the drafter.

Specifically, shareholder Portugal filed for Chapter 7 bankruptcy in 1993 and 2005. However, at the time our client addressed Amazon's request that ePort refinance its debt to Amazon, Mr. Port's credit history did not indicate any bankruptcy, serious delinquency, open judgment, or tax liens. The credit history was devoid of the bankruptcies because they were over ten (10) years old.

Attached are copies of Mr. Portugal's credit reports that show that his credit is clear of any liens, delinquencies or bankruptcies.[1]

Further, pursuant to the Revised Code of Washington, "no consumer reporting agency may make a consumer report containing … bankruptcies that, from the date of adjudication of the most recent bankruptcy, antedate the report by more than ten years."[2]

Since Mr. Portugal's credit histories were clear at the time of application, Shareholder Portugal answered truthfully when completing the application for the refinance Amazon proposed and Amazon's allegation of fraud is baseless.

Even if there were an issue, the issue belongs to the dissolved corporation, not Shareholder Portugal because all of Shareholder Portugal's actions were in behalf of the corporation.

*False Allegation of Secreted Funds*

While all of the allegations not specifically addressed are denied, with specific regard to Amazon's allegation that any funds were secreted, the following facts were omitted by Amazon in its Demand for Arbitration.

There was never any payment of $750,000.00 as described by Amazon.

---

[1] See Exhibit A (Credit Karma report from Transunion and Experian indicating lack of bankruptcy, serious delinquency, open judgment, or tax liens against Mr. Portugal's credit history).
[2] RCW 19.182.040 §(1)(b).

The last "loan" was actually the last Amazon refinancing of prior Amazon debt. The history of the re-financings that Amazon presented and provided are as follows:

| Loan # | Origination Date | Refinanced Amount | Amazon Refinanced |
|---|---|---|---|
| 101570773 | 10/5/2015 | $332,000 | 12/30/15 |
| 190240574 | 12/30/2015 | $500,000 | 3/4/16 |
| 105409229 | 3/4/2016 | $500,000 | 5/12/2016 |
| 138826091 | 5/12/2016 | $671,000 | 7/15/2016 |
| 126559327 | 7/15/2016 | $670,000 | 9/12/2016 |
| 143560041 | 9/12/2016 | $727,000 | 11/9/2016 |
| 122259861 | 11/9/2016 | $750,000 | |

In sum, the allegation of funds being secreted is baseless. There was no $750,000 provided to anyone under the agreement that Amazon has presented to the AAA.

Counter Claims:

*Unfair Business Practice*

Amazon's practice of repeatedly offering our client refinancing offers constituted unfair and deceptive acts and practices in the conduct of commerce and was unlawful.[3] Amazon continued to loan our client large sums of money despite its declining business and Amazon's activities that decreased ePort's business and its ability to pay Amazon's debt. Amazon had actual knowledge that our client's business was declining as a result of its own conduct.

Despite this knowledge and active conduct, Amazon issued the loans. As such, our client has suffered injury due to this unfair practice and is entitled to a civil claim for damages against Amazon.[4]

Further, due to the nature of the loan agreement, Amazon's practice of making loans to declining businesses and also damaging businesses it loans money to, is against public interest because it has the capacity to injure other Amazon sellers.[5]

---

[3] RCW 19.86.020.
[4] RCW 19.86.090.

*Predatory Lending*

Pursuant to both the Truth in Lending Act ("TILA")[6] and the Federal Trade Commission Act ("FTC Act"), consumers are broadly protected from unfair or deceptive acts or business practices.[7] Amazon violated both acts by using predatory lending tactics when targeting our client with loan and refinance offers. Amazon's practice is known as "flipping," or inducing a consumer to refinance a loan, repeatedly, and often within a short time frame and at high interest values.[8]

Here, Amazon has not only repeatedly induced our client to accept increasing debt, but did so with knowledge that our client's business was steadily declining…and declining because of Amazon's direct activities against ePort.

Requested Relief:

Mr. Portugal respectfully requests the following relief:
(1) Compensatory and punitive damages in an amount to be later determined;
(2) That Amazon be ordered to pay Mr. Portugal's reasonable attorney's fees and all costs associated with this arbitration;
(3) The dismissal of all personal claims against Mr. Portugal; and
(4) The dismissal of all claims against ePort, Inc.

Requested Hearing:

Should the AAA choose to ignore its' lack of jurisdiction over Mr. Portugal and the dissolved corporation, the undersigned respectfully requests that the hearing be conducted in either North Carolina or New York City to limit the costs to respondents who clearly should not be subject to this procedure.

I look forward to hearing from you and remain

Cordially Yours,

*CJ Rosenbaum* (electronically signed)
C.J. Rosenbaum, Esq.

---

[5] RCW 19.86.093.
[6] See 15 U.S.C. § 1601 et seq.
[7] See 15 U.S.C. § 45(a).
[8] See, e.g., Kay Stewart, *Widow Sold Her House to Pay Loan She'd Hoped Would Ease Her Debts*, Louisville Courier-Journal, Feb. 16, 1997, at 16 (lender refinanced borrower's loan four times in nine months). Lenders in the consumer finance industry have long relied on refinancing, and sometimes repeated refinancing, as a source of business. See W. Artz & R. Neihengen, Jr., Analysis of Finance Company Ratios in 1994, 78 J. Commercial Lending 33, 37 (Sept. 1995) (showing that, from 1990 to 1992, companies refinanced existing loans to present borrowers in a range of 63% to 66.8% of the cases); Report of the Presiding Officer on Proposed Trade Regulation Rule: Credit Practices, Federal Trade Commission, Aug. 1978, at 43-44 (creditors self-reported refinancing loans for existing customers in a range of 35% to 75% of accounts, with an average of 56.5%).